## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**LLOYD BROWN, on behalf of himself
and all others similarly situated**

    **Plaintiff,**

v.                                                   **Case No: 5:18-cv-490-Oc-30PRL**

**ANSAFONE CONTACT CENTERS,
LLC**

    **Defendant.**

___

### REPORT AND RECOMMENDATION[1]

Plaintiff filed this action against his former employer, Ansafone Contact Centers, LLC, on behalf of himself and similarly situated Ansafone employees for unpaid overtime in violation of the Fair Labor Standards Act ("FLSA"). On December 7, 2018, the Court conditionally certified a class of Ocala-based hourly paid customer service representatives who were employed on or after January 9, 2016. (Doc. 32). The Notice approved by the Court (Doc. 39) was mailed out on January 9, 2019 and the sixty-day opt-in period closed on approximately March 10, 2019. During that period, sixty-two people (including Plaintiff) joined the action. (Docs. 3-7, 18-23, 48, 51-109).

Shortly before the approved notice was sent to prospective plaintiffs, Defendant conducted meetings with employees in its two Ocala locations regarding this FLSA action. Plaintiffs claim that these meetings were improper and prevented putative class members from joining the instant lawsuit. Accordingly, Plaintiffs have filed the current motion asking the Court to stay discovery,

___

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

reopen the notice period, and issue a corrective notice. Because the parties offered conflicting declaration evidence regarding what happened at the meetings, the Court conducted an evidentiary hearing on August 23, 2019, the transcript of which is filed on the docket. (Doc. 131). Based on the evidence adduced at the hearing, as well as the papers filed by the parties, I submit that Plaintiffs' motion (Doc. 120) should be denied.

I.     **Background**

After the Court conditionally certified a class, but before Notice was sent to putative class members, Defendant conducted a total of four staff meetings with all then-employed customer service representatives at Ansafone's two Ocala locations in groups of between 15-25 employees. The meetings were led by Lynda Owens, Operation Manager, and Dawn Johnson, HR Manager. The parties disagree about what happened at the meetings.

Plaintiffs claim that during the meetings, the customer service representatives were discouraged from joining the lawsuit and told that they would suffer consequences if they did. In support, Plaintiffs submitted declarations and elicited testimony at the hearing, from two former employees who attended the meetings – Angel Maldonado (a supervisor) and Julie Moman (a customer service representative) – each of whom stated that the customer service representatives were threatened with retaliation, and that as a result of the meeting, they (and others), did not join the lawsuit.

At the hearing, Mr. Maldonado, who attended both meetings at the 34th Avenue location, testified that Ms. Owens discussed the lawsuit and advised the attendees that they would be receiving a notice in the mail. According to him, Ms. Owens "basically was speaking to us in a very aggressive manner and tone" and "strongly discouraged that any of us get involved, as there could be consequences, basically insinuating that we could lose our jobs." (Transcript at 14, 15).

He testified that a few CSR's in attendance asked questions about the lawsuit and Ms. Owens said, "Don't participate." (Transcript at 13, 16). On cross-examination, he testified that Ms. Owens said: "The company basically strongly discourages that anyone get involved, as there could be—as there—basically would be consequences." (Transcript at 27). When asked by the Court to state "what words were used that made it clear to you that there would be consequences for joining the lawsuit," Mr. Maldonado testified: "[b]asically, when she had said that the company discourages that anyone get involved in the lawsuit and that should you get involved there would be consequences." (Transcript at 57-58). According to Mr. Maldonado, Ms. Johnson did not address the group.

Mr. Maldonado also testified that following the meeting, he briefly spoke with Ms. Owens about the lawsuit and she "was letting [him] know that – not to get involved," and that when he "basically" asked her, "Am I going to lose my job over this?", she "looked at me and said, you know -- inferred that, yeah, I would lose my job." (Transcript at 18, 27-28). Mr. Maldonado did not mention this conversation in his declaration; to the contrary, he stated, "I did not speak further with Ms. Owens or Dawn about the meetings or Mr. Brown's lawsuit against Defendant on the date of the meetings" or since then. (Doc. 120-1, Maldonado Declaration at ¶38).

Julie Moman also testified that Ms. Owens told the attendees that they would be "getting some documentation in the mail, and to just, you know – you know, don't mind it, just don't pay attention to it." (Transcript at 66). And that if the attendees joined the lawsuit, "there could be consequences," which she took to mean that they could lose their job. (Transcript at 66-67, 94). She testified that Ms. Owens' demeanor was "kind of like firm—not really loud . . . kind of like a warning type of tone." (Transcript at 67).

In contrast, Defendant contends that the information shared in the meetings mirrored the information in the Notice and that there were no threats of retaliation. Lynda Owens, the Director of Operations, welcomed employees and introduced Dawn Johnson, who was the new Human Resources Manager. Together, they covered the following points:

- A lawsuit had been filed by a former employee, Lloyd Brown, against Ansafone alleging that Ansafone failed to pay him and other employees like him overtime in violation of the Fair Labor Standards Act.
- Ansafone denies the allegations and maintains that its policies comply with the law.
- Employees were reminded that they are not permitted to work off the clock and if they have difficulty clocking in they can and should see their supervisors to get their time entries corrected.
- Ansafone provided CSR's contact information so they could receive a Notice in the mail about the lawsuit which would contain more information --they should read it carefully and make their own decisions.
- Ansafone has a strict no retaliation policy. If employees choose to join the lawsuit there will be no negative consequence to their jobs.
- The Notice will have the contact information for Mr. Brown's lawyers and Ansafone's lawyers. Employees can contact them.

(Doc. 121-2, Declaration of Randy Harmat at ¶10; Doc. 121-3, Declaration of Lynda Owens at ¶8; Doc. 121-4, Declaration of Dawn Johnson at ¶¶9-12; Transcript at 128).

At the hearing, Ms. Owens and Ms. Johnson both confirmed that they discussed only the above information and said nothing to contradict the Notice (which they had reviewed prior to the meetings). (Tr. 99-100, 125-28, 135-36). Ms. Owens and Ms. Johnson specifically denied delivering any threats of retaliation against the customer service representatives, discouraging them from joining the lawsuit, or telling them that there would be consequences for joining the lawsuit. (Tr. 102-04, 136-37). Ms. Owens testified that no one, including Mr. Maldonado, asked her any questions after the meetings. (Tr. 103).

Defendant also offered declarations from twenty-two customer service representatives, all of whom attended the meetings and averred that they were not threatened with loss of job,

demotion, loss or hours or a schedule change, or any other threats of any kind to their jobs. (Docs. 121-7, 121-8).

## II. DISCUSSION

As a starting point, there is no bright-line rule barring a defendant from speaking with putative class members. *See Bobryk v. Durand Glass Mfg. Co., Inc.*, No. 12-cv-5360 (NLH/JS), 2013 WL 5574504, at *3 (D.N.J. Oct. 9, 2013); *Longcrier v. HL-A Co., Inc.*, 595 F.Supp.2d 1218, 1225 (S.D. Ala. 2008) (noting "it is quite clear that a defendant in a § 216(b) action is not categorically forbidden from communicating with prospective opt-in plaintiffs."). However, federal courts have exercised their discretion to correct the effects of communications with potential FLSA collective action members after misleading, coercive, or improper communications are made. *See Billingsley v. Citi Trends, Inc., 560 Fed. Appx. 914,* 922 (11th Cir. 2014).

Here, Plaintiffs failed to offer compelling and credible evidence that the meetings were misleading, coercive, or otherwise abusive. As discussed above, the only evidence offered by Plaintiffs were the declarations and testimony of Mr. Maldonado and Ms. Moman, both of whom came forward after they were terminated from their employment with Ansafone.[2] I have no trouble finding that their vague testimony was not persuasive. Mr. Maldonado testified that Ms. Owens "basically" told the customer service representatives not to participate and that if they did there "basically" would be consequences. By qualifying much of his testimony with the term "basically," it was unclear whether he was quoting what Ms. Owens said or merely summarizing his impression of what she said or intended.

---

[2] To be more precise, Ms. Moman didn't come forward as much as she agreed to sign a declaration after she was contacted and asked to.

Indeed, a plain reading of Mr. Maldonado's testimony reveals its deficiencies, but here is an example. Plaintiffs' counsel asked Mr. Maldonado, "Did Ms. Owens *make clear* that there would be consequences for joining Mr. Brown's lawsuit during the meetings?", to which he answered, "Yes, she did." Then counsel asked: "you took that as a clear threat of retaliation?", to which he again answered: "Yes." (Transcript at 55-56) (emphasis added). Hoping to get some clarity, the Court then asked Mr. Maldonado: "What does that mean? What does it mean 'make clear?'" Mr. Maldonado's response, along with others, exemplifies the unconvincing nature of his testimony: "To make clear" he said "is – in a manner in which you speak to someone, it basically implies that the consequences would be great." The exchange (and the Court's effort to get clarity) continued as follows:

> THE COURT: So you're not talking about words that were used, you're talking about someone's tone of voice, someone's body language?
> THE WITNESS: Yes.
> THE COURT: What words were used that made it clear to you that there would be consequences for joining the lawsuit?
> THE WITNESS: Basically, when she said that the company discourages that anyone get involved in the lawsuit and that should you get involved there would be consequences. From working there as much as I'd worked there and seen things for my own eyes, I know the consequences of the termination.
> THE COURT: When you say the word 'basically,' it seems like a qualifier to me. It seems like – it's not – you're not quoting what someone said, you're just summarizing your impression of what someone said.
> THE WITNESS: That's why I questioned her, Your Honor, when I had the opportunity to ask her about – 'what do you mean by consequence?' I said, 'Do you mean like lose our jobs?' And she says, 'Well . . . .' So you're basically telling –
> THE COURT: So she said 'well" and shrugged?
> THE WITNESS: Yeah. You're basically telling me, yeah, that that could be – that's it.

(Transcript at 57-59).

The Court then asked him, if it was clear from her presentation that you would lose your job for joining the lawsuit, why did you have to go back and ask her that. Candidly, his response was even more confusing:

> It's kind of like if you were to say to me, 'You know what's going to happen if you lie under perjury.' Well, I already know, you know, you can get a charge for that. So I already know by you saying that what that consequence would be. The same thing with – when Lynda says certain things, I already know, because she's my boss. And I've interacted with her so much that when she says – she talks about 'consequences,' it means you're getting terminated.

(Transcript at 58-59). The response appears to be more of an explanation of why he now is confident he knows what she meant by "consequences" (assuming she even said that), but the question was why, if he knew what she meant, did he go back and ask her what she meant. Indeed, although the Court didn't directly ask him this, why did he go back and ask her what she meant in a conversation he neglected to include in his declaration.

In other words, Mr. Maldonado's testimony that he spoke to Ms. Owens after the meeting was contradicted by his own declaration (which appears to have omitted it), and the testimony of Ms. Owens (who denied it). Specifically, Defense counsel, while trying to understand what Mr. Maldonado was alleging Ms. Owen's actually said (which, it became clear, did not involve the word "fired," but rather, it involved a "nudge", or a "shrug"), established that the conversation itself was omitted from his declaration:

> Q [By Defense Counsel]. But my question was: She didn't say that, did she?
> A [By Mr. Maldonado]. Not in the exact words.
> Q. The exact words were?
> A. Using 'fired.'
> Q. *She didn't use fired. What she said was there would be consequences?*
> A. *Yes*. And basically I asked her, you know, 'Am I going to lose my job over this?' And she looked at me and said, you know – she *inferred* that, yeah, I would lose my job.
> Q. You had a conversation with Ms. Owens?
> A. I did.
> Q. And she told you that you would basically lose your job if you didn't -- if you joined the lawsuit?
> A. Yes.
> Q. That's not anywhere in your declaration, is it?
> A. Can you rephrase that question, because I don't exactly understand what it is you're asking me.
> Q. Sure. *This is the first time that you've told anybody that Ms. Owens said that to you; is that right?*

>A. *Yes*. She basically -- again, she never used the word 'fired.' She basically said that there would be consequences. And when I had asked her would those consequences they were referring to be me losing my job, *basically she nudged at me*, like, yeah.
>Q. And who else was present for this conversation?
>A. No one was present, just me and Lynda.

(Transcript at 28) (emphasis added). Mr. Maldonado later tried to explain the discrepancy between his testimony and the declaration, but it was unconvincing. (e.g., Transcript at 29-30). In any event, the whole of his testimony is that she used the word "consequences" and "nudged" (or shrugged) at him.

Likewise, Ms. Moman's testimony was short on details, as she testified that Ms. Owens told the attendees that they should not pay attention to the Notice and that there could be consequences. The extent of her testimony can best be summarized by the following exchange: When Plaintiff's counsel asked her whether Ms. Owns made any comments about participating in the lawsuit, she said: "Yes, she did. She just said that if we – you know, if we joined, there could be consequences." (Transcript at 66-67). Then, when asked if Ms. Owens was "stern and direct", she said "yes," and further when asked how the meeting ended, she said: "Just basically – she just said, you know, that we'll be getting this stuff in the mail and just – she said there could be consequences if we decided to participate." (Transcript at 67). The extent, then, of Ms. Moman's testimony was that Ms. Owens said there would be "consequences" for joining the lawsuit.[3]

---

[3] The Court's exchange with this witness further highlights the point:

>THE COURT: And so it's your testimony that Ms. Owens uttered the words to the group, 'If you join this lawsuit, there will be consequences?'
>THE WITNESS: Yes.
>THE COURT: And did she say what those consequences would be?
>THE WITNESS: No.
>THE COURT: Did anyone -- did you hear anyone ask her, 'Ms. Owens, what will those consequences be?'
>THE WITNESS: No.
>THE COURT: Did she elaborate in any way on what those consequences might be?
>THE WITNESS: No.

While the excerpts of the transcript clearly illustrate the lack of detail, they fail to convey the witnesses' demeanor, body language, and unnatural pauses, all of which made the testimony of Mr. Maldonado and Ms. Moman even less believable. In sharp contrast, Defendant presented credible and convincing testimony by Ms. Owens and Ms. Johnson regarding the content of the meetings. They identified the specific information discussed at the meeting and denied delivering any threats of retaliation against the customer service representatives, discouraging them from joining the lawsuit, or telling them that there would be consequences for joining the lawsuit. (Transcript at 102-04, 136-37). Their testimony alone was compelling. Their testimony, however, was further corroborated by declarations from twenty-two customer service representatives, all of whom attended the meetings and averred that they were not threatened with loss of job, demotion, loss or hours or a schedule change, or any other threats of any kind to their jobs. (Docs. 121-7, 121-8).

Based on the foregoing, I submit that Plaintiffs have not made a sufficient showing of coercion, intimidation, or otherwise improper contact by Defendant. Accordingly, I recommend that Plaintiffs' motion for sanctions (Doc. 120) be **DENIED.**

Recommended in Ocala, Florida on September 18, 2019.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

---

THE COURT: Other than the words 'if you join the lawsuit, there will be consequences,' did she say anything else? Were there any other words that she used that gave you the impression that the -- that the consequences would be bad?
THE WITNESS: No.
THE COURT: Did she ever say you would be fired?
THE WITNESS: No.

(Transcript 94).

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy